## John F. Devine, Administrator, Appellee, v. Kelly-Atkinson Construction Company, Appellant.

### Gen. No. 15,032.

1. MASTER AND SERVANT—*when doctrine of assumed risk does not apply.* If an accident is due to the foreman's negligence in giving a wrong signal, the doctrine of assumed risk cannot be invoked, inasmuch as the risk of negligence on the part of the master personally, or of his representative, the foreman, not a fellow-servant, is not assumed.

2. VERDICTS—*when not excessive.* Held, in an action for death caused by wrongful act that a judgment of $3,500 in favor of the mother, brothers and sisters of deceased (a young unmarried man) even if prior thereto he had not supported them but only occasionally sent his mother five or ten dollars, will not be held by a reviewing court to be excessive.

3. INSTRUCTIONS—*when undue emphasis not given to question of damages.* Held, that there was no improper reiteration or undue emphasis indulged in by the court in its instructions to the jury upon the question of damages.

4. INSTRUCTIONS—*when refusal as to order of consideration of issues will not reverse.* Held, that it was not error in view of the other instructions given in this case, for the court to refuse to give an instruction as follows:

"The jury are instructed that if under the instructions of the court they find from the evidence in this case that the plaintiff is not entitled to recover, then they will not have occasion to consider at all the character or amount of the plaintiff's damages."

CHYTRAUS, P. J. dissenting.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. ROBERT W. WRIGHT, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Affirmed. Opinion filed July 15, 1910. Dissenting opinion filed July 26, 1910, by Mr. Presiding Justice CHYTRAUS. *Certiorari* denied by Supreme Court (making opinion final).

KREMER & GREENFIELD, for appellant.

JACOB C. LEBOSKY, for appellee.

MR. JUSTICE MACK delivered the opinion of the court. The deceased was in the employ of defendant as a struc-

tural iron worker at the time of his death, assisting in the erection of the iron work used in connection with the track elevation at Fifty-first street. Light beams and cross beams resting on posts were strung across the street. A heavier facial girder was to be put in position at the extreme east end of the structure; it was lying across the beams and the deceased and a co-worker were on the structure on either side of the girder adjusting the "dogs" which were in the nature of a pair of ice-tongs, to the middle of the girder. The method of putting it in position was to raise it, by the pulley suspended from the tip of the boom, the movable arm of the derrick which itself was on a flat car some twenty feet to the south of the south wall of Fifty-first street, from a gondola car standing in front of the derrick car, and if for any reason it had to be dropped elsewhere than at its ultimate position, then to take it up again and by swinging the boom to put it in position. The boom was thirty-five to forty feet long. The engine had two drums, operated by steam, from one of which a wire cable to a block in the end of the boom enabled the boom to be raised or lowered at will, independently of the load, and from the other of which a cable running through a pulley in the end of the boom caused the load to be raised or lowered. While this could be done independently of the boom, both could also be raised or lowered together. As the girder in question was lifted from the gondola car and swung east, the blocking under the car, which prevents listing or upsetting, was seen to be insufficient and for that reason the girder was lowered before it reached its ultimate position, to the panel of open steel structure that was being constructed, and was placed across the beams by the deceased and others. The boom was then swung west to enable the blocking to be readjusted and in doing this, to escape wires, the tip of it was lowered so that when it was swung back to the point above the girder its tip projected north five or six feet. During this time the "dogs" remained attached to the girder and were held in place by the deceased and another man. In order properly to pick up the girder, with the load cable from the tip of the boom to the girder, at plumb and not

at an angle from a point five or six feet north of the center of the girder, it was necessary to raise the boom again. Unless this were done, the load would at once swing out on being lifted. Instead of raising the boom, however, the engineer raised the load; the girder swung out; the deceased, in the hope of saving himself from being struck, jumped upon it as is customary, but girder and man slipped to the ground and death ensued. If the engineer, carelessly mistaking the signal given him by the foreman, operated the wrong drum, his negligence, being that of a fellow servant, would be no ground for recovery; if the foreman, however, gave the wrong signal, his negligence would render the defendant liable.

The jury necessarily found that a wrong signal was given. The evidence was in conflict and unless we can say that the evidence clearly does not preponderate in favor of the plaintiff, we should not be justified in reversing the judgment on this ground.

On behalf of plaintiff, one Kiplinger, a railroad switchman, who at the time was employed by the railroad, handling the iron and looking after the derrick in question, testified on direct examination that standing northeast of the derrick he saw the men attaching the dogs to the girder and saw the foreman, whose back was toward the men, give a signal to raise the load. He testified further, "That was the signal (illustrating). I had seen those signals given before in that kind of work and when I saw that, the load was raised from where it was standing." On cross examination he testified that he had never been engaged in or worked at or been around that kind of work prior to the present job; that at the time he was a switchman; his engine was there to handle the derrick and gondola cars and that he had been doing this for something over a month; that the foreman "gave a signal like that (illustrating)."

"Q. Just one hand? A. He didn't give a signal like that (illustrating); just like that (illustrating).

Q. Shook his fist like this? A. Yes.

Q. That is, twisting it? A. Yes, sir.

Q. How many signals are there that they give in work of that kind? A. I have seen three.

Q. What are they? A. They gave a signal like that (illustrating) to raise the load. If they wanted the boom raised, they gave a signal like that (illustrating). If they wanted to stop, they gave a signal like that (illustrating).

Q. Did you see any other signals given besides those three at any time? A. Not this day.

Q. Well, had you at any time while they were engaged there on this work? A. Only motioning for men, they would motion to each other for help.

Q. Were there any other signals that you observed while you were there which were directions to the engineer? A. No, sir.

Q. Those three are the only ones? A. Yes.

Q. When did you learn those signals? A. When I first went to work on the job.

Q. When you first went to work on the job? A. Yes sir.

Q. How did you come to learn them? A. Well, sir, I learned that from watching the men work.

Q. Did you have any particular occasion to know what those signals were? Did you need to know that? A. I could not say that I did, for my part."

On re-direct he testified that it was half a minute from the time he saw the foreman give the signal that the deceased fell. A second witness, Whitman, who was ten feet away from the place of the accident working in the gondola car, stated that just as the girder started to pick up he heard the superintendent holler and saw the deceased jump for the iron and fall with it. It took less than half a minute. He did not see the signal given. He further testified:

"Q. What is the signal to go ahead with the load, Mr. Whitman? A. Like this (illustrating).

Q. Did you see the signal—

Mr. Greenfield: Can't we get that signal described and get it in the record?

Mr. LeBosky: Q. Mr. Whitman, did you see the signal that Mr. Kelplinger gave while he was on the witness stand? I did.

Q. In describing the signal Mr. Fornwall gave. A. I did, yes.

Q. How long have you been a structural iron worker? A. About thirteen years.

Q. Are you acquainted with the signals given to the engineers in derrick cars? A. Yes.

\* \* \* \* \*

Mr. LeBosky: Q. Now, you just show the signal to go ahead with the load. A. Like this (illustrating).

Mr. Greenfield: I would like that to be described in the record, your Honor, with the fist and thumb up, raising his fist and thumb up and down—

A. Going ahead is like this (illustrating). If a man gives a boom up signal, it is like this (illustrating). You give a twist of your hand. There is a great many men give different signals.

Mr. LeBosky: Q. Well, is the thumb in the air at the time? A. It is not necessary. His thumb might stick up a little bit.

Q. Is the hand folded at the time? A. It is not supposed to be.

Q. It can be that way, can it? A. Yes. I seen lots of men give signals that way.

Mr. LeBosky: All right. You may take the witness.

Mr. Greenfield: Q. This motion you give for going ahead with the load is a sort of up and down movement, of the hand, isn't it? A. No, sir, it is not supposed to be.

Q. This motion you gave, wasn't it? A. It doesn't look that way to me; that doesn't look like an up and down motion by any means (illustrating). If I was giving that up and down motion, it would be this way (illustrating).

Q. The motion you give is not merely a twisting of the wrist? A. It would be hard to give a signal at that distance for an engineer to understand by twisting the wrist."

On behalf of defendant, the foreman Fornwall testified:

"Mr. Greenfield: Q. Tell what you did.

A. I gave the signal to boom up, top up his boom.

Q. By top up the boom, what do you mean by that?

A. Raise the end of the boom that is up.

\* \* \* \* \*

Q. Now, the signal that you gave to the engineer means what, in your code? A. It means to raise the boom.

Q. Does it mean anything else? A. No, sir.

Q. Now, what other signals did you have for raising the load? A. We had this signal for raising the load (illustrating).

Q. A sort of a twist of the wrist? A. Yes; sometimes you get in a position where you can't give it that way and you go up further here and sometimes you just crack it to him that way (illustrating), if you are in a hurry.

Q. Do you have in your business a regular code of signals that all structural iron men understand? A. Yes, sir.

Q. Now, did you, after this boom came around to the east side, ready to be raised in position, again give any signals to the engineer to lift that load?

Mr. LeBoskey: I object to that; it is leading.

The Court: He may answer the question.

The Witness: No. sir.

* * * * *

Q. What does the signal stand for which you gave the engineer that morning to top up that boom? A. That was to raise the boom.

Q. That was to raise the boom? A. Yes; just to raise the boom."

Burtscher, the superintendent, testified:

"Q. State what you saw? A. I saw him giving a signal to raise the boom.

Q. Describe the signal to the jury. A. This way, he had his thumb up this way (illustrating).

Q. And that signal means in your code—

A. To raise the boom.

Q. Was it to raise the boom? A. Yes.

Q. Anything else? Does it mean to do anything else except to raise the boom? A. Nothing else at all."

On cross examination he testified:

"Q. Now, if that boom had been raised and the slack had been let fall and that signal had been given there would not have been any danger, would there. A. It aint necessary to give—

608     Appellate Courts of Illinois.

Devine v. Kelly-Atkinson Const. Co., 156 Ill. App. 602.

Q. Well, would there have been? Yes or no.

A. No, there wouldn't have been any danger."

This is the entire testimony on the question of signals.

To summarize this evidence: an entirely disinterested witness who in the course of a month, by observation of three signals, had learned their meaning, asserts that he saw the foreman signal: "shook his fist like this, twisting it." He illustrated each of three signals—one to raise the boom, the other the load and the third to stop, but in the absence of a description of them in the record it is impossible to say just what was done. Any doubt arising from the incompleteness of a bill of exceptions must be resolved against the appellant. The second disinterested and expert witness described the signal to raise the load, according to counsel's statement of it, as "fist and thumb up, raising his fist and thumb up and down." A boom up signal, he said involves a twist of the hand, the thumb not necessarily being in the air. The motion to raise the load is not an up and down motion, though it is not merely a twisting of the wrist.

The foreman who, if he gave the wrong signal would be responsible for the death, asserted positively that he gave the signal to raise the boom, not the load, but he agreed with Kiplinger that a twist of the wrist is the signal for raising the load, whilst the superintendent says that he saw him give the signal to raise the boom; "that he had his thumb up" (illustrating).

While Kiplinger's testimony as to the meaning of each signal would not be as realiable as that of an expert, his testimony as to his own observations of what was actually done would be none the less credible, because he was not fully acquainted with or had failed to observe signals in use other than the three.

On this testimony, or rather on so much of it as is preserved in this record, which contains no description of many of the illustrations, a reviewing court would not, in the judgment of the majority of this court, be justified in finding, contrary to the verdict of the jury confirmed by the trial judge, that the evidence of the foreman and superintendent,

positive though it was, preponderated as against that of the switchman, inasmuch as the credibility of these several witnesses was as important an element as their knowledge of signals and powers of observation. Without discussing the evidence thereon in detail, the jury were justified, in our opinion, in finding that the deceased was not guilty of contributory negligence.

If the accident was due to the foreman's negligence in giving the wrong signal, then the doctrine of assumed risk cannot be invoked, inasmuch as the risk of negligence on the part of the master personally or of his representative, the foreman, not a fellow servant, is not assumed.

During the examination of the superintendent the court sustained an objection to the question: "How many different signals are used in this business?"

The only relevancy of the question would be that stated by counsel, to show that Kiplinger, who had observed only three signals, was deficient in his powers of observation. The question, however, as framed is not directed to the number of signals that were actually used at that time in that particular work, but to the structural iron business generally. We do not, however, deem the ruling such serious error as to justify a reversal, even if the inquiry referred to the signals actually used at that work. The jury knew full well that Kiplinger was not an expert; that he had learned only certain signals; that he did not know how many others were used; but his testimony was clear and positive as to the actual signal given at the time which was entirely different from the one that should have been and that, according to the foreman and superintendent, was in fact given.

Complaint is made of the instruction on the question of damages because of reiteration and also of the amount of the judgment because of an alleged lack of sufficient direct evidence as to pecuniary loss. Judgment of $3,500 in favor of a mother, brothers and sisters, in a death case, even if prior thereto the deceased, a young unmarried man, had not supported them but had only occasionally sent his mother $5 or $10, will not be held by a reviewing court to be excessive.

There was, in our judgment, no undue emphasis laid on the subject of the damages.

Though the trial court might well have given defendant's instruction reading:

"The jury are instructed that if under the instructions of the court they find from the evidence in this case that the plaintiff is not entitled to recover, then they will not have occasion to consider at all the character or amount of the plaintiff's damages,"

yet the refusal so to do does not constitute error. The court had carefully and fully charged as to the prerequisites to any recovery and had directed a verdict of not guilty if any one of them was not supported by a preponderance of the evidence; the jury could not, therefore, have been in any manner misled by the refusal to state that unless there was liability the question of damages need not be considered.

An instruction in one place referred to care exercised by plaintiff instead of the deceased. This was clearly a clerical error and of no importance in the case.

Inasmuch as the count charging negligence in the selection of servants was withdrawn, instructions bearing on the duty in that respect were properly refused.

Finding no reversible error, the judgment is affirmed.

*Affirmed.*

MR. PRESIDING JUSTICE CHYTRAUS dissenting.

Unles the foreman gave the wrong signal, the judgment of the trial court is unjust, contrary to law and unwarranted. The crucial question in this case is, therefore, whether the foreman gave the right signal or a wrong one. The foreman gave the engineer the signal either *to raise the boom without the load,* which signal it was his purpose to give for carrying out the work being done, and, therefore, that may be termed the right signal, or *to raise the load,* which signal it was not his purpose to give and the giving of which would therefore have been a mistake and a wrong signal under all the circumstances—not wrong for any reason especially pertaining to or connected with the decedent. Plaintiff's intestate

was at the place he stood, when struck, to prepare the facial beam to be raised and, in that connection, to watch the boom and cable whereby the beam was to be raised. It required but a moment to step over the beam and place himself in absolute safety. The raising of a heavy beam by a boom and cable is not an instantaneous act. Some portion of time is required even before the beam begins to rise.

The question which signal was given is one of fact and the burden of proving that the foreman gave a wrong signal rested upon the plaintiff in the trial court, as it rests upon the plaintiff in this court. Does the evidence on that question preponderate in favor of the plaintiff? If it does not so *preponderate,* the judgment of the trial court should be reversed because the trial court overruled the motion for a new trial and, in that respect, erred and because the evidence fails to sustain the judgment.

Notwithstanding what may be thought of the policy of the law upon this subject, it is, under the law of this state, as now existing, the duty of this court and, consequently, of every member thereof, to examine and weigh the evidence upon every material controverted question of fact in a case brought here, where the errors assigned are such as those here assigned. It is our duty, independently of the conclusions of fact arrived at by the jury and the trial judge, to arrive at a conclusion and to determine for ourselves upon such questions of fact, according to the individual judgment and understanding of each of us, upon the evidence adduced, after duly considering and weighing such evidence. Where, upon the evidence, we find that there is fairly room for difference of opinion, we are, of course, not obliged to and should not disregard the fact that there has been a verdict by a jury and a judgment thereupon by a trial judge. In forming a judgment and arriving at conclusions upon questions of fact, it is true the jury and the trial judge have the advantage of seeing the witnesses and observing their conduct and demeanor. We, however, are not without advantages not possessed by the jurors. We have the opportunity of carefully reading the testimony of witnesses, of weighing precisely what

they have said and of more deliberately considering the precise meaning of their statements unaffected by the hurry and bustle of the trial and the confusion, frequently occurring in trials, of several persons talking practically at the same time in critical moments.

As to our being required to exercise our independent judgment, the Supreme Court laid down the rule in that respect in Chicago City Railway Company v. Mead, 206 Ill. 174, 181. With reference to the duty entrusted to this court, where error is assigned upon the overruling of a motion for a new trial, it is there said that in considering and deciding upon error so assigned this court must discharge its duty not according to the judgment of others but according to its own judgment. It is further said: "The law commits to the sound judgment of the Appellate Court the question whether the trial court erred in overruling a motion for a new trial on the ground that the verdict is against the weight of the evidence," and that: "If a verdict and judgment are clearly against the weight of the evidence, a new trial should be awarded by the Appellate Court and the issues submitted to another jury." In Donelson v. East St. Louis Ry. Co., 235 Ill. 625, 628, it is held that: "If a verdict is manifestly against the weight of the evidence, it is not necessary that it should further appear that it was not the result of the impartial and honest judgment of the jury, nor that it resulted from prejudice, passion or some improper motive or condition," and that: "It is not the rule that an appellate court will not reverse the judgment of a trial court where the evidence of the successful party, when considered by itself, is clearly sufficient to sustain the verdict." In Borg v. C., R. I & P. Ry Co., 162 Ill. 348, 355, it was held that the statute conferring power upon the appellate courts in respect to questions of fact "is designed to confer upon the Appellate Court more extended powers than are possessed by the judge of the trial court, and to give to the former court the power, upon a consideration of the facts, to find them different from the finding of the court from which the case is brought." So

much for the power of this court and the duty which flows from the investment of the court with this power.

After as careful a weighing of the evidence as I am capable of making, it appears to me not only that the plaintiff has failed to establish by a *preponderance* of the evidence that the foreman gave the wrong signal but that the preponderance of the evidence is with the defendant. As stated, the right signal called for the raising of the boom *without the load;* the wrong signal called for the raising of the boom *with the load.*

The evidence of the witness Whitman, clearly, does not make for or against either side of the controversy in this respect. There were but three witnesses who testified on the subject whether the foreman gave the right or the wrong signal. The testimony of one of these three, Kiplinger, is to the effect that the foreman gave the wrong signal; this is favorable to the sustaining of the judgment. The testimony of the other two, Fornwall and Burtscher, is to the effect that the foreman gave the right signal; this is against the sustaining of the judgment. A very close consideration of the three witnesses and their testimony, their knowledge of and familiarity with the signals involved, the possibility of their being interested, their intelligence and opportunity of observation and the possibility of mistake or of deliberate falsifying on the one side or the other, is necessary, particularly when, as here, in order to sustain the judgment of the trial court, it must be found that truth lies with the one witness and falsity on the side in favor of which the two witnesses have testified. Everything else being equal, it is unquestionably the duty of a court to find with the greater number. Has the rule that the preponderance lies with the greater number been in anywise overcome here? If so, the means whereby it has been done have escaped me in a close inspection of the record, and the manner in which it has been overcome has in nowise been pointed out. The reason why a judgment should be rendered against the defendant for $3,500, upon such a state of the evidence as that appearing by this record, does not specifically

appear, unless it be on the single ground that the jury found that a wrong signal was given.

The witness Kiplinger testified that he was a painter by trade but had been a railroad employe for twenty-three years and that during the last twelve of these twenty-three years he had been a switchman; that he had never worked in the structural iron business and had never been around work of that kind before switching at the place in question; that at the time of the accident he was employed as a railroad switchman by the Western Indiana Railroad and was one of the switching crew engaged with a locomotive in handling the derrick car and in bringing in car loads of structural iron for the track elevation being done at the place in question and that he had been engaged at that work for something over a month; that while there engaged he observed only three different signals which were given as so many different directions to the engineer and these signals he learned when he "first went to work on the job" by watching the men on the work, not, however, because he had any "particular occasion" to know the signals; that when the accident occurred he stood northeast of the derrick and saw Colley, the deceased, standing outside of the facial beam or girder which was to be put into position and that on the other side thereof there were two men; that he saw the foreman give the signal *to raise the load* and he saw the cable tighten *gradually* "and the minute the load was raised it swung over and knocked this man [Colley] off;" that "some men hollered 'hang onto the load' and he grabbed at the iron" and "he kind of hung onto it" "and the hook [somewhat like an ice tong] slipped from the center, or near the center," of the girder and both the girder and he went into the street; and that when Colley was knocked off he stood back about eight feet from the brink or edge, wherefrom he fell into the street. The witness Whitman, called on behalf of plaintiff, testified that he was about ten feet from where the accident occurred; that he did not see the signal given by the foreman; that the first he observed was the boom raising and the iron start up and then he heard Burtscher calling; and that the width of the space

outside of the girder or beam, where Colley stood, was not over a foot or eighteen inches. This witness, as well as other witnesses, contradicted Kiplinger in various respects which, while they did not go to indicate which of the signals was given, tended materially to impeach either his memory or his power of observation, at all events the reliability of his testimony. This witness corroborated Burtscher's testimony to the effect that he, the latter, had come where he could see the signal given and that he called to Colley. Defendant, in order to contradict and discredit Kiplinger, who testified that he saw but three signals used, both as to his truthfulness and his power of observation, sought to introduce evidence of the number of signals used. This evidence the trial judge excluded. Technically, the ruling in that respect may have been accurate because the precise purport of the question put was as to how many signals were used *in the business*. The question was too broad and comprehensive. However, in this particular instance it appears to me the interests of justice may have been better subserved by permitting the question put to have been answered or to have informed the examining attorney of the mistake in the question. Answering would undoubtedly have resulted in bringing out the number of signals used during the period Kiplinger had the opportunity of observation.

Kiplinger is in nowise corroborated. My brethren point out in the opinion herein that the foreman agreed with Kiplinger that a twist of the wrist is the signal for raising *the load* and add: "whilst the superintendent says that he saw him give the signal to raise the boom: 'that he had his thumb up.'" There is no dispute as to what the signals were nor as to their being correctly given by all the witnesses and I see no corroboration of Kiplinger in the fact that the foreman agreed with him as to what the signal for raising the load was, nor do I see the slightest inconsistency between what the superintendent said and what Kiplinger and the foreman had said. When the hand is closed it may be so closed that the thumb is held up and not enclosed by the fingers, and as I understand, by so closing the hand and then twisting the wrist is

616        APPELLATE COURTS OF ILLINOIS.

Devine v. Kelly-Atkinson Const. Co., 156 Ill. App. 602.

the way the signal to raise the boom *without* the load was given—not by twisting the wrist with the hand open or the fingers enclosing the thumb. In this connection it may be added, as the record shows, that the question put and the actual answer of the superintendent was: "Q. Describe the signal to the jury. A. *This way;* he had his thumb up this way (illustrating)."

Why, in view of the facts and circumstances of this case, any stress should be laid upon the failure to preserve in the record any description of the illustrations of the signals, as if that circumstance operated, to any extent, to prevent this court finding contrary to the verdict of the jury, I confess I fail totally to comprehend.

Kiplinger's testimony, all there is in the record to sustain the judgment of the trial court upon any view of this case, I have adverted to. On the other hand, against that evidence and in opposition to sustaining the judgment, I find: The witnesses Fornwall, who was the foreman, and Burtscher, who was the superintendent for the defendant of the work being done, both testified that the right signal was given. Fornwall, who gave the signal, of course knew whether the right signal was given. Burtscher, who had just come from a different part of the work then being done, testified that he saw Fornwall give the signal to raise the boom and that the signal given meant to raise the boom and nothing else. Burtscher testified also, that when he saw the signal given he called out to Colley to get away from in front of the beam and that he called two or three times. In this he is corroborated by other witnesses and contradicted by none. These witnesses, Fornwall and Burtscher, experienced in the business and familiar with the signs, were not mistaken. They either told the truth or deliberately testified falsely. There is nothing in the record tending to impeach their credibility, unless it be the fact of their being in the employ of the defendant and, as to Fornwall, the further fact that he gave the order to the engineer and that, consequently, as the fault lies either with him or with the engineer, he might want to shift the blame to the engineer. But, on the other hand, is no credit to be given to

men who have attained such positions as these men then held? Will not the slight interest of retaining their employment, as an inducement to commit perjury, be offset by their positions? While it may not be said that there has been any such successful discrediting or impeachment as to eliminate the testimony of any witness, yet in so far as there has been any discrediting, to any extent, it appears to me to tend to weaken the testimony of the one witness, not the two. It is a question in my mind whether Colley did not fail to exercise reasonable care for his own safety and, furthermore, I fail to see wherein, upon this record, the plaintiff has established his case by a preponderance of the evidence and I am therefore of the opinion that this judgment should be reversed.